GLENN SMART, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smart v. Commissioner
Docket Nos. 37602-84, 37603-84.
United States Tax Court
T.C. Memo 1987-279; 1987 Tax Ct. Memo LEXIS 279; 53 T.C.M. (CCH) 1011; T.C.M. (RIA) 87279; June 8, 1987. Glenn Smart, pro se. Darren M. Larsen, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In two notices [1] of deficiency one for the years 1975 through 1980 and the other for 1981 and 1982, respondent initially determined deficiencies in and additions to petitioner's [2] income taxes as follows: Additions to tax
Section
Section
Section
Section
Year
Deficiency
6651(a)(1) [3]
6653(a)(1)
6653(a)(2)
6654
1975
$9,819
$2,455 $491 $425
1976
10,149
2,537
507
378
1977
11,845
2,961
592
423
1978
11,765
2,941
588
376
1979
8,043
2,011
402
339
1980
13,557
3,389
678
863
1981
14,091
3,523
705
plus 50% of
1,079
interest on
underpayment of
$14,091
1982
11,962
2,991
568
plus 50% of
1,164
interest on
underpayment of
$11,962
*281 After concessions, the issues are: (1) what is the amount of petitioner's taxable income for each of the years in dispute, (2) is petitioner entitled to joint return computation of his tax liabilities, and (3) are any of the underpayments in petitioner's income tax for the years in issue due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a)? [4]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and the exhibits associated therewith are incorporated herein by reference. Glenn Smart, petitioner, and his wife, Shirley J. Smart, resided in Anchorage, Alaska at the time the petitions were filed. During the years in issue, he owned and operated as a sole proprietorship a roofing contracting business known as General Roofing. During such years he also received net income from interest and rents in the following amounts: Interest
Rental
Year
Income
Income
1975
$607
1976
523
1977
879
1978
681
1979
2,179
1980
$1,515
5,637
1981
9,100
9,900
1982
7,971
9,974
*282 In 1980, petitioner received $5,000 from the sale of real property of which $3,023 was long term capital gain. In 1982, he realized a long term capital gain of $151 on the sale of other real property and received $1,000 in ordinary income from the Alaska Permanent Fund ("Alaska dividend"). In 1980, petitioner's thirteen-year old daughter, Sandra Smart, suffered extensive injuries in an automobile accident for which she recovered $45,000 in 1980 from an insurance company. Petitioner incurred and paid as a result of Sandra's injuries medical expenses of $3,683, $8,668 and $2,260 in the years 1980, 1981, and 1982, respectively. On July 23, 1980, petitioner entered into a contract with General Electric for the purchase of certain radio equipment costing $10,542 for use in his roofing business. With respect to this purchase he paid $2,542 down and financed the balance over six years with monthly payments of $187.20 including interest of $76.09 in each payment. The radio equipment was received by petitioner prior to January 8, 1981 and for each month during 1981 he made the monthy payments required under the contract. On February 10, 1982, he received a notice from General Electric *283 that it had not yet received payment for the air freight charges totalling $233.43 for the aforementioned radio equipment or for certain additional radio equipment which he had contracted for on August 12, 1981 at a cost of $1,288. At or near the end of 1975, petitioner gave his business records to a bookkeeper so that she could prepare his income tax return for that year. Shortly thereafter the bookkeeper was indicted for embezzlement and left Anchorage with the result that petitioner was unable to recover all of his records from her. He later contacted another tax preparer about filing the 1975 return but was advised to wait and file the 1975 return when he filed his 1976 income tax return. Before the 1975 and 1976 returns were completed, this tax preparer also left Anchorage and moved to the State of Washington which is nearly 1,500 miles from Anchorage. Petitioner then took his records for 1975 and 1976 to a certified public accountant who refused to become involved in the preparation of the delinquent tax returns. Eventually in 1980, petitioner located an accounting firm which was willing to prepare his returns for the years 1975 through 1979 provided he would sort through *284 and organize the business records. In an attempt to do this petitioner secluded himself in a cabin so as not to be disturbed but the cabin burned and petitioner's records for 1975 through 1979 were completely destroyed. On August 10, 1984, respondent mailed to petitioner two separate notices of deficiency, one for the years 1975 through 1980 and the other for 1981 and 1982. In the deficiency notices, respondent determined petitioner's income for each year in issue by using an estimated 2,000 hours of annual employment at the average hourly wage of a roofer as reflected in the "Alaska State Wage Rate of Selected Occupations," a publication of the Alaska Department of Labor. Upon receiving the notices of deficiency, petitioner filed a timely petition from each and hired Elder Pratt to prepare his income tax returns for 1975 through 1982. With petitioner's assistance Pratt prepared joint returns for petitioner and his wife for the years 1975 through 1979 and hand delivered them unsigned to an agent of respondent in Anchorage in or about August 1985. Even though unsigned the returns were accepted by the agent together with petitioner's check in the amount of the total tax liability *285 reflected on the returns. Pratt then undertook the preparation of joint returns for 1980, 1981 and 1982 but suffered serious head injuries in an automobile accident before they were completed. Pratt eventually prepared joint income tax returns for these years. However, these unsigned returns were not submitted to respondent until the trial in June of 1986. After issuing the notices of deficiency, but prior to trial, respondent learned petitioner was not employed during the years 1975 through 1982, as a roofer receiving an hourly wage but instead was the actual owner and operator of General Roofing. Respondent also learned at or about the same time that while all of petitioner's business records for the years 1975 through 1979 had been allegedly destroyed as indicated above his records for 1980, 1981, and 1982 consisted of only cancelled checks, check registers, bank statements (except for 1982), and deposit slips on a bank account maintained by petitioner in the name of General Roofing at First National Bank of Anchorage. For 1981, the records also included a computer print out purportedly showing the gross receipts, bank deposits, loans and expenses of General Roofing. From *286 the above records respondent computed, and the parties have stipulated, that petitioner had gross receipts, and net profits for 1980 and 1981 [5] from General Roofing in the following amounts: Taxable
Gross
Net
Percentage of
Year
Receipts
Profits [6]
Net to Gross
1980
$300,608
$85,618
28.5%
1981
460,228
24,036
5.2%
The parties have also agreed that for 1975 through 1979 and for 1982 petitioner *287 had gross receipts [7] from General Roofing in the following amounts: Taxable
Gross
Year
Receipts
1975
$200,000
1976
250,000
1977
300,000
1978
326,000
1979
284,608
1982
447,033
By using the average of General Roofing's net profit percentages for 1980 and 1981 (17 percent rounded to the nearest whole number) respondent determined petitioner's net profits for the other years by simply multiplying the average net profit percentage times the stipulated gross receipts of General Roofing for each year. When the net profits determined in this manner were added to the stipulated amounts of petitioner's interest income, rental income, gain from the sale of property and his Alaska dividend, respondent concluded that the deficiencies and additions to tax set forth in the statutory notices were understated for every year except 1982. Without objection by petitioner, and with leave of the Court, respondent then filed amendments to his answers in which he recomputed the deficiencies and the resulting additions to tax due from petitioner as *288 a married taxpayer filing separately. The deficiencies and additions to tax as set forth in respondent's amended answers are as follows: Additions to
tax under
Section
Section
Section
Section
Year
Deficiency
6651(a)(1)
6653(a)(1)
6653(a)(2)
6654
1975
$13,162 $3,291
$658
$395
1976
17,860
4,465
893
536
1977
23,091
5,773
1,155
808
1978
25,815
6,454
1,291
774
1979
15,862
3,966
793
634
1980
46,167
11,542
2,308
2,770
1981
4,488
1,122
224
*
314
1982
37,398
9,350
1,870 **
3,456
OPINION Taxable Income
Under section 6001 all taxpayers are required to keep sufficient records to enable respondent to determine their correct tax liability. In the absence of such records, or even when the taxpayer keeps records which support his return as filed, respondent is authorized to compute a taxpayer's income by any method which, in respondent's opinion, clearly reflects such income. See , affg. a Memorandum *289 Opinion of this Court; . Respondent has great latitude in adopting a method for income reconstruction and such method only need be reasonable in light of all the surrounding facts and circumstances. ; . Respondent's determination can be adjusted, however, if warranted by the circumstances or if the method is inadequate in some respect. . Petitioner contends that respondent's revised reconstruction of his taxable income fails to take into consideration certain deductions and nontaxable receipts for 1980 and 1981 which, he argues, not only affect his taxable income for these years, but also distort the profit percentage used in computing his taxable income for the other years. First petitioner asserts that in 1980 he received as a loan from his daughter the $45,000 in insurance proceeds recovered by her. In this connection, petitioner and the daughter both testified in an honest and forthright manner, that the insurance proceeds *290 were received and used by petitioner although they were unable to identify any particular deposit as representing such funds. Respondent merely argues that petitioner's failure to produce any documentary evidence of the loan or to point to any bank deposit in the amount of $45,000 is sufficient to establish that the alleged loan was never made. We are unable to agree with respondent because again petitioner and his daughter both testified in a creditable manner that a written memorandum of the loan was made but was subsequently lost. Moreover the use of the funds by petitioner would constitute normal and logical conduct under the circumstances since the daughter was only thirteen years old at the time and since petitioner had assumed responsibility for her medical bills and actually paid over $14,000 in such expenses during 1980, 1981 and 1982. The absence of a deposit in the exact amount of $45,000 is also of no consequence since the stipulated bank records reflect several deposits of sufficient size to account for that amount even if it was all deposited at once. We conclude, therefore, from the record as a whole, that petitioner received nontaxable receipts of $45,000 in 1980 *291 which were deposited in his bank account. Petitioner also argues that he is entitled to deductions for interest and depreciation in 1981 with respect to the radio equipment that he purchased for his trucks. In support of this contention he points to General Electric's letter of February 10, 1982, which clearly indicates that the radios were shipped to petitioner in January of 1981 and fails to mention any default in the installment payments during 1981. We have found, therefore, that in January of 1981 petitioner received the equipment, placed it in service, and during 1981 paid twelve monthly installments each of which included $76.09 of interest. The letter, however, also establishes that petitioner did not pay any freight charges on the equipment in 1981. From the record before us, it is also apparent that in his computation of petitioner's net income from the roofing business all deposits to the bank account of General Roofing were treated by respondent as being receipts from that business even though the record as a whole clearly indicates that petitioner had no other bank account in which to deposit the substantial amounts of income such as interest and rents he received *292 from other sources. Consequently, we are also satisfied that appropriate adjustments should he made to respondent's computation of the net income realized by petitioner in each year from General Roofing for the stipulated amounts of income realized from the other sources. To the extent that the above adjustments affect the profit percentages of General Roofing for 1980 and 1981, a further adjustment will have to be made to the average profit percentage applied to the gross receipts for the other years in issue. In other words, respondent's computation of petitioner's gross receipts for each year from General Roofing is to be adjusted downward, where applicable, for the stipulated amounts of income from interest, rents, sales of property, and the Alaska dividend. To the extent that these adjustments affect the profit percentages in 1980 and 1981 a further adjustment will have to be made to the average profit percentage used in determining the net profits received from General Roofing in the other years. Filing Status
Petitioner contends that he is entitled to have his tax liabilities computed with the favorable rates applicable to joint returns because the returns filed *293 by Mr. Pratt were prepared on that basis and the returns for 1975 through 1979 were accepted by respondent together with a check for the tax reflected thereon. Respondent contends that none of the forms filed by Mr. Pratt constituted valid returns. With respect to 1980 through 1982 respondent further contends, citing , that an election to file a joint return cannot be made by a taxpayer after a deficiency notice is issued on the basis of a separate return computation and the taxpayer has filed a petition with this Court. [8]
We agree with respondent with respect to the validity of the returns because section 6061 *294 requires that an income tax return be signed in accordance with applicable forms and regulations. Without a signature, a return is not verified and cannot be subject to the penalties for perjury mandated by section 6065(a). Consequently, the unsigned returns were not returns at all. . [9] Furthermore the acceptance in this case by respondent's agent of the check accompanying part of the unsigned forms does not cause such forms to become valid returns. , revd. on other issues . We conclude, therefore, that petitioner has failed to establish that a valid return was filed for any year in dispute and as a result no election has been made to have his tax liability computed on the basis of a joint return. [10]
*295 Additions to Tax Under Section 6653(a)(1) and (2)
Respondent's determination that the underpayment of petitioner's income tax was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653 is presumptively correct and petitioner has the burden of proving that the additions to tax under section 6653(a)(1) and (2) are improper. ; Rule 142(a). Petitioner contends that the unfortunate experiences he had with a number of accountants and return preparers, as set out in our findings, as well as the accidental destruction of his business records establishes that his failure to pay his taxes was neither negligent nor the result of intentional disregard for applicable rules and regulations. While we sympathize with petitioner with regard to his experiences, we are unable to conclude that his failure to file proper returns for at least seven years and even after receipt of respondent's notices of deficiency can be attributed to any one of such experiences or to all of them in combination. In the first place, the record contains no evidence that he ever had any books or records *296 other than cancelled checks, check registers, bank statements, deposit slips, and in one year, a jumbled computer print out. Furthermore according to his own testimony even these records were so disorganized that one of the accountants he approached refused to consider the preparation of the returns and another accountant refused to do so unless he organized the records into some usable form which he failed to do. Under these circumstances we are unable to conclude that his failure to keep proper records and file timely and correct returns was not at least negligent especially since he was admittedly capable during the same period of operating a roofing business which had an annual gross income of $200,000 to $450,000. Accordingly, respondent's determinations with respect to the additions to tax under section 6653(a)(1) and (2) are sustained. To reflect the foregoing. Decisions will be entered under Rule 155.
Footnotes
1. Both notices were dated August 10, 1984 and were issued to Glenn Smart only. ↩
2. Although both deficiency notices were mailed to Glenn Smart alone, both he and his wife filed joint petitions. The petitions were dismissed for lack of jurisdiction insofar as they related to Shilley (Shirley) J. Smart. ↩
3. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided.↩
4. Petitioner concedes liability for the additions to tax under section 6651(a)(1) and section 6654 subject to a recomputation under Rule 155.↩
5. By agreement of the parties this stipulation is subject to the adjustments we have hereinafter found to be appropriate with respect to (1) the proceeds of a loan received by petitioner from his daughter in 1980, (2) deductions in 1981 for depreciation on certain radio equipment as well as interest paid in connection with the purchase of such equipment, and (3) any change which stems from the removal of petitioner's income from sources other than the roofing business from the bank deposits of General Roofing. ↩
6. The parties were unable to agree on the net profits for 1975 through 1979 because all cancelled checks, check registers, bank statements and deposit slips had been destroyed and for 1982 because such records for that year were incomplete.↩
7. By agreement of the parties this stipulation is subject to the same adjustments set forth in footnote 5, supra.↩
*. 50% of interest on underpayment of $4,488 ** 50% of interest on underpayment of $37,398↩
8. In , we stated, as dictum, that "if taxpayers have failed to file returns, the election to make a joint return may not be made after respondent has issued a notice of deficiency to either spouse based on rates for separate returns, and the spouse to whom such notice was issued has filed a petition with this Court." We note that this statement was made prior to our decision in .↩
9. See . ↩
10. We are not faced here with a situation where the taxpayer did not file a valid Federal income tax return before the Commissioner issued the notice of deficiency, and filed a valid joint return after the Commissioner issued the notice of deficiency and before the case was submitted for decision. See .↩